LILBURN A. SCOTT, RESPONDENT, v. MARY ELLEN SCOTT, APPELLANT.
—192 S. W. (2d) 668.

Kansas City Court of Appeals.   January 14, 1946.

954

*Marion D. Waltner,* and *Clarence C. Chilcott* for appellant.

956

· *Henry M. Shughart* and *Walter A. Raymond,* for Respondent.

DEW, J.—This is an action for divorce brought by the respondent against the appellant. The decree of divorce was granted by the trial court to respondent, and appellant appealed.

The petition for divorce is in the conventional form and the grounds alleged are, in effect, that the appellant (defendant) was guilty of such indignities to plaintiff (respondent) as to render his condition intolerable in that while plaintiff was away from his home in the military forces of the United States, defendant became infatuated with other men, associated with other men with whom she took trips away from home to divers places and remained with them long periods at places unknown to the plaintiff, improperly and immorally conducted herself during such association, and has refused to cease such association, all to the humiliation and embarrassment of the plaintiff among his friends and associates in his home town of Weston, Missouri; that plaintiff has separated from defandant, and established his own residence in Jackson County, Missouri, where he is stationed in the military service. The petition states that there were no children born of the marriage.

The answer of the defendant admitted the marriage, the fact that both parties are residents of the State of Missouri, that there were no children born of the marriage, and denied, generally, plaintiff's allegations of misconduct on her part.

Further answering, defendant specifically denied the allegations of misconduct in the petition as above related, and, in effect, further denied that plaintiff was the innocent, injured and aggrieved party, but averred that he had offered defendant such indignities as to render her condition intolerable in that he is of a very jealous disposition and inclined to make false accusations against the defendant in both public and private places; that as a result of false statements involving defendant with plaintiff's brother-in-law, plaintiff has purposely or in disregard for the truth thereof, repeated such charges as true to the defendant and others, thereby slandering her, and exposing her to humiliation and embarrassment; that upon the basis of such false slander, plaintiff filed this suit; that plaintiff is possessed of a violent temper; it at times sullen and moody, refusing to speak to defendant for a week at a time; that he has cursed defendant and struck her; that he is neglectful of his duty to support and maintain her as his wife, rendering it necessary for her to earn money to supply herself with the necessities of life; that plaintiff is able-bodied, and receives an adequate income to enable him to provide for her maintenance, and is actually receiving an allowance from the United States army for subsistence to this defendant, although said allowance is not being used for such purpose. The prayer of the answer was that plaintiff's petition for divorce be denied, and for attorney's fees.

The nature of the assignments of error requires the substance of all the material evidence be stated. Substantially, plaintiff testified that his home had been in Weston, Missouri, during all the time he was in military service, and for many years prior thereto; that he now lives in

Kansas City, where he has resided since his release from Camp Lee, Virginia, October 16, 1944; that he was married to defendant November 16, 1933, in Independence, Missouri, and had continued to live with her as her husband up to the time shortly preceding the filing of his petition; that he went into the armed services in 1942 as a private and during such service was located at various camps in the United States, including Camp Lee, at which he was commissioned a second lieutenant on October 13, 1944; immediately thereupon he returned to his home in Weston, Missouri, and has temporarily been assigned to the Quartermaster Depot in Kansas City. Up to the time he entered the army in 1942, he had never heard of any misconduct on the part of defendant except rumors that he felt did not come from any competent source.

Plaintiff further testified that the first thing that caused him concern as to his marital status was a letter that he received from the defendant between the 6th and 10th of October, 1944. This letter contained items of local news, and concluded with the following paragraph:

"I really was disappointed to find out that I wouldn't be able to come to graduation but guess it can't be helped. Believe it or not but to see you get your commission would have meant a great deal to me. Because that is what I have wanted for you ever since you went into the Service. And once given the chance there wasn't a doubt in my mind from the very first that you wouldn't make it. So you did and if I don't ever have the chance to glory in it with you after I've wished for it so long—then let me tell you now that I'm very proud of you and no matter what happens from here on, don't ever forget it, for I mean it with all my heart.

Luck to you Lieutenant!<br>With love,<br>Mary Ellen.''

The paragraph of the letter so quoted seemed unusual to the plaintiff and he retained the letter. On the evening prior to the graduating ceremonies he telephoned to his sister at Weston, Mrs. Billie Vaughn, and inquired of her what, if anything, had happened. She declined to tell him, but said she would do so upon his arrival, and suggested that he see her when he came home.

Upon returning from Camp Lee, he, by prearrangement, met his sister in North Kansas City, where he obtained the information upon which he based his suit for divorce. He then went to his home at Weston the same day.

Plaintiff testified that since his return he had never lived with the defendant as her husband, nor stayed at her home; that the allegations of his petition as to defendant's conduct were based on information furnished him by his sister Mrs. Vaughn and her husband Walter Vaughn; that he had no personal knowledge concerning those charges; that he had always treated his wife as a husband should, with kindness

and affection, and furnished her with a home and support; that the information furnished him, as aforesaid, caused him honestly to believe that his wife had become infatuated with another man, and that she was guilty of the allegations of misconduct in his petition; that upon his several visits home during his military service the defendant told him of none of these occurences. He described Weston as a small town where his sisters and their families lived, and, also, his parents, and that he was vary much humiliated by the conduct of the defendant complained of.

On cross-examination plaintiff admitted that defendant had steadfastly denied the charges referred to; that he had never fully advised her of the things that he had heard because she was reluctant to discuss the same with him; that practically all he had told her was "I don't think you have been fair with me while I was away;" that upon his return from Camp Lee he did not ask her for an explanation of the letter mentioned because he did not feel it was necessary; that the explanation he received from his sister (Mrs. Vaughn) was that defendant had been guilty of misconduct with Walter Vaughn; that his wife had made confession to his sister Mrs. Vaughn. He stated the reason that defendant did not attend his graduation was because of transportation conditions, and because the authorities discouraged the attendance of friends and relatives on account of the war conditions; that he explained all this to the defendant by telephone; that upon his return home he did not show the letter in question to the defendant and ask for a confession; that if defendant had wished to make it she could have done so; that when he arrived at home he merely shook hands with the defendant; that he stayed but a few minutes, and left to see his mother and father. As he left the defendant showed evidence of crying, which plaintiff thought was rather unusual, and defendant said: "You will be back, won't you?" and plaintiff answered "Yes." She asked him again if he would be back and he said he would; then he returned in three or four hours after visiting his parents, and asked her if she had anything she wanted to say to him, and defendant said "No." He then went back to the home of his parents to stay with them.

Plaintiff admitted receiving from the defendant a letter thereafter dated November 10, 1944, as follows:

"Dear Lilburn,

I have received a letter from your lawyer, Mr. Henry Shughart, in which he requests that I call or see him at his office. I am sorry but I shall do neither one because you already know that I am not in favor of a divorce.

Next Thursday will be our wedding anniversary and we will have been together eleven years. Like everyone else we have had our good times and our bad ones. Some of the bad ones have been plenty rough but I have stood by you and tried to help. I worked all along buying my own clothes as well as some of the furnishings for our home to

make it a nice place to live. When you entered Service two years ago, I still kept that home for you to return to some day. At Camp, whenever it was at all possible, I came to stay with you there as long as I could. On the other hand there are our good times which I shall always remember and which you seem to want to forget.

So Lilburn if it is your desire to let your people tell you what to do and insist on taking your sister's word, which is after all only what her husband has told her, instead of your wife's then you can have papers served on me by the Sheriff of this county. But remember you wanted it and I am going to fight it to the last ditch in the land. Down deep in your heart you know that I care for you or I would have given up the ship long ago.

Sincerely,<br/>Mary Ellen.''

Plaintiff stated that pursuant to arrangements made by Mr. Vaughn he had gone to the defendant's home on Sunday next preceding the trial to talk with her; that witness had recently eaten lunch with Vaughn in Kansas City, had attended church a time or two with his sister and nephew when Vaughn also was there, and on one occasion had gone to church with Mr. and Mrs. Vaughn; that on Christmas day he was at the home of his parents where a number of relatives and friends also attended, and Mr. Vaughn was likewise there; that to a certain extent he had avoided Mr. Vaughn; that these occasions were after he had heard rumors of defendant's misconduct with Mr. Vaughn, and after plaintiff honestly believed the truth of the same. He denied that Mrs. Vaughn had in his presence told Mr. Vaughn that if the latter did not testify for plaintiff in this case she would leave Vaughn. He stated that while at Camp Lee the letters from defendant were not as regular as usual. He admitted that he had no personal knowledge of the acts he complained of.

Plaintiff admitted that on one occasion he turned defendant over his knee and spanked her, or ''paddled'' her when she refused to get off the running board of his car when he started to work, and on another occasion, when defendant had hit him, cursed him, and kicked him, and refused to obey some command he had made, he struck her. He also admitted that he drank intoxicating liquor in his home and took a drink whenever he desired, but denied that he was ever drunk in the sense that he was unable to take care of himslf, and he said that the defendant drank moderately, and' then only gin.

Mrs. Billie Vaughn, sister of the plaintiff, testified that she and her husband Walter Vaughn have long lived in Weston, Missouri, and have been engaged in the funeral business since 1938. They lived in an apartment above their place of business and have a four year old boy. She occupies the highest local office in a prominent women's lodge organization, in which she has been active for many years. In June, 1944, she made a trip to Washington to visit her sister for two weeks.

Shortly after her return home her husband asked her to take a suit of his clothes to the cleaners and, before doing so, she emptied his pockets and found soiled handkerchiefs on which there were "lipstick and everything;" that she questioned her husband about that circumstance and "where they came from" and he told her to whom they belonged. She had borrowed a suitcase from defendant for her trip, and she immediately took the suitcase and "this evidence" to the defendant and questioned her. At that time the husband of witness had not admitted to her any improper conduct with defendant. In defendant's apartment the witness threw the suitcase down and took defendant to task about her alleged conduct with witness's husband, and defendant asked who had told her about it and, being told that witness's husband had admitted it, said: "Aha, I was just afraid sometimes he would squeal."

Mrs. Vaughn further testified that on that occasion she asked defendant why she had so conducted herself, and defendant replied that it was because she was lonesome. Defendant then said: "I'll have you know this has not been the first time," and referred to other occasions when witness was on trips to Arkansas and St. Louis. Defendant then stated: "I'll have you know my husband (plaintiff) and I have never gotten along. He has never satisfied me." Witness pleaded with her not to tell plaintiff about the situation while he was in the officer's training school, but witness said she intended to tell her parents and her husband's parents about it. She said defendant admitted having had intimate relations with witness's husband, but defendant told her it did not occur in the Vaughn home, but in Kansas City; and admitted that the association between defendant and Vaughn had been going on for a long time, and that defendant was receiving big money to break up witness's home, set her out in the street, and to ruin her business.

Mrs. Vaughn further stated that she then went back and confronted her husband with the statements made by the defendant. She had asked him why he had done such dishonor to her and to her home, but admitted that she was still living with him, as that was her home. She denied that she had told her husband (Walter Vaughn) that she would divorce him if he did not testify in this case as to the things she had related. She stated that she did not know how long she would continue to live with her husband.

Plaintiff, recalled for further cross-examination, said that during his investigation of his charges against defendant, he went to the apartment of a Mr. Dietz in Kansas City, and later to the latter's office. Mr. Dietz was a union official and had charge of certain union matters respecting the Weston Distillery, where defendant was employed, and where the plaintiff had formerly been employed. He said Mr. Dietz told him of an occasion in June, 1944, when defendant came to his office on certain business of the union and told him that she had ridden to Kansas City with someone, perhaps her brother-in-law, who was

to come back for her; and that she waited a long time for that person to come for her, during all of which time, Mr. Dietz had told him, she was in the latter's presence; that Dietz had said that about midnight defendant stated she did not wish to keep Mr. Dietz waiting any longer, but would go to the bus station and wait there for the next bus; that Mr. Dietz said, in effect, that he took her to the bus station. He said that the next day in Mr. Dietz's office the latter showed him a memorandum in pencil, showing a conference on union business on June 27th with the defendant; that Mr. Dietz said he had made that memorandum at the time of the conference with defendant for the for the purpose of incorporating it into his report to the union; that purpose of incorporating it into his union which referred to his conference with defendant on June 27th. Witness stated that he had made this call on Mr. Dietz at the suggestion of the defendant.

Plaintiff produced in his behalf Major B. H. Eversmeyer, who said he knew plaintiff before and after plaintiff's entrance into the military service, and testified to plaintiff's high reputation for truth and morality, and the high character of his associations.

Walter Vaughn, husband of plaintiff's sister, took the stand in plaintiff's behalf. He stated that he recalled the occasion when his wife returned from a trip to Washington in June, 1944; that he remembered her finding a handkerchief in his pocket with lipstick on it; that when she called his attention to it he did not at that time admit any improper relations with defendant; that thereupon she went to the home of the defendant. He stated that upon her return she very forcibly called his attention to the matter of his conduct with defendant; that after this suit was filed he went voluntarily to the office of defendant's counsel with counsel for plaintiff for the purpose of disclosing what his testimony would be if put on the stand under oath. No depositions had been taken up to that time, except the deposition of the plaintiff; that a few days thereafter he gave his own deposition in the office of counsel for defendant.

Mr. Vaughn testified to numerous instances of his misconduct with defendant; a trip to St. Joseph with defendant in 1939, taking a lady friend of defendant's to a hospital there, and while in that city he registered himself and defendant as husband and wife at a tourist cabin, using the name of a good friend of his who lived in Weston; to several occasions thereafter, when Mrs. Vaughn was in Kansas City or in St. Louis or in Arkansas, when defendant came to his living quarters in Weston and stayed all night; a trip to Kansas City with defendant and Mrs. Vaughn where, by prearrangement, Mrs. Vaughn was left with a sister, and witness and defendant met down town and went to a small apartment hotel where he registered them as husband and wife, again using the name of a friend of his; another trip to Kansas City in June, 1944, while Mrs. Vaughn was in Washington,

when witness and defendant went to various places in Kansas City, and returned to Weston at 1:00 o'clock the next morning.

Mr. Vaughn testified that on the occasion of the taking of his deposition, he asked defendant why she was contesting the divorce case, and what she expected witness to do. He stated "The whole thing was she didn't like my wife keeping her home when this action was breaking up her own home, and she said she would fight it as long as she could."

Vaughn testified that before his deposition was taken he told defendant's counsel what his testimony would be, because he did not want to testify. He admitted telling counsel that he thought his wife was going to leave him, and told him in the presence of plaintiff's counsel that his wife had told him many times that if he did not go in and testify in the case along the lines then outlined that she would leave him. He admitted that he was still living in the same house with his wife, but under estranged circumstances; that he still speaks to the plaintiff and they have eaten together, met at the same family gatherings, and had been to church together. He had never discussed this case with the plaintiff. He said that the arrangement which he sought was that if defendant stopped defending the case, the matter of his conduct with her would not have to be brought out. He testified that an agreement had been made in the office of defendant's counsel to the effect that counsel would take his and other depositions, and would not enter them in court unless defendant went through with her contest. He said the episode in Kansas City in June was on either Tuesday or Wednesday before the 4th of July; that he and defendant made a trip to Kansas City only once in June of that year and none in May, nor at any time before. He stated that he never was with her any time when she went to a labor union office.

By stipulation it was admitted that certain witnesses present in court would be placed upon the stand to testify that the defendant, so far as they knew, enjoyed a good reputation in her community.

Defendant testified that prior to October, 1944, she had no knowledge of the charges made against her by the testimony of Walter Vaughn. She denied any misconduct with Vaughn or with any other man during her married life. She stated that she had been a faithful and dutiful wife to the plaintiff. During the year 1944, she had trouble with her sister-in-law Mrs. Vaughn, who had made false accusations against her. She said she did go in an ambulance in 1939 to St. Joseph with Mr. Vaughn at the request of the manager of the Weston Distillery, where she was employed, on the occasion of taking the wife of the latter to a hospital there; that the manager was not present at St. Joseph. She denied that she went with Vaughn on that day to any place and registered under a false name; that she never heard of such a claim until November, 1944. She denied, specifically, all of the episodes described by Mr. Vaughn. She said up until recently she had, at the request of both Mr. and Mrs. Vaughn, gone to their funeral home,

as well as to their living quarters, to answer telephones in their absence. This she did purely as a courtesy and accommodation. During those times she committed no improper act with any person. Asked for an explanation of the letter she wrote to plaintiff in October, 1944, she said she had reference "to the fact that perhaps when he returned home from school his folks would get to him with this atrocious story before I could see him, and that perhaps he would take their word for it before coming to me to give him my explanation of the situation, and we would separate." She said that in the meantime Mrs. Vaughn had made charges against her, and had told her that she was going to tell the plaintiff. She said that throughout all that period she loved her husband, and had lived with him as his wife, and that she wrote the letter in sincerity for the purpose of convincing plaintiff that he should remain her husband; that from plaintiff's action upon his return she knew that plaintiff's folks had told him the story. Plaintiff did not stay long and did not at that time make any charges against her of misconduct with Walter Vaughn. About 10:00 o'clock that evening he came back and told her he was going to get a divorce. He did not tell her why, or make any charges against her, or give her any chance to explain. Witness told him that he had heard only one side of the story and plaintiff said: "I think I have heard enough." Since that time defendant has not lived with the plaintiff. She knew that rumors had been circulated in Weston about their trouble because persons had asked her about them, but that she had not circulated any of them.

Describing the occasion when Mrs. Vaughn came to her apartment, defendant testified that she told Mrs. Vaughn she had done nothing more than drink a Coca Cola with Vaughn at Kansas City. Mrs. Vaughn asked her if she had been at Vaughn's residence. Defendant replied that she had been there one during Mrs. Vaughn's absence, but that Mr. Vaughn was not there. Mrs. Vaughn then asked her what time defendant and Mr. Vaughn returned home from Kansas City, and defendant replied: "If your husband has told you everything, ask him what time he returned home." She denied that she then told Mrs. Vaughn that she had been out with Mr. Vaughn because she was lonesome, or said: "This is not the first time." She denied that she told Mrs. Vaughn that she had been with Mr. Vaughn while Mrs. Vaughn was in St. Louis, or in Arkansas, and had never made the statement that she and plaintiff had never "gotten along very well," nor that he had never "satisfied" her. She testified that she was entirely pleased and happy with her present marital relationship up to the present instant.

Describing the episode in June, 1944, defendant testified that it was only one time in May, June or July, 1944, that she was ever in a car with Mr. Vaughn on a trip to Kansas City, and that was on June 27th; that she was an official in the labor union to which she belonged and had some union business to transact with the union's business agent and

attorney in Kansas City, Earl Dietz. A week before the trip she had seen Vaughn at the grocery store and inquired if there was any time that he was going to Kansas City late in the day that she might ride with him, as Mr. Dietz would be in his office after 4:30 p. m. The following Tuesday, Mr. Vaughn stopped his car on the street and inquired of defendant if she had ever seen her union representative. When told that she had not, he offered to take her as he was just starting to Kansas City. It was still light and a little after 8:00 o'clock. She stated that Vaughn waited in his car across the street from Dietz's office until she could find out if Mr. Dietz was not there.

Defendant reported in a few minutes that Dietz was not there, but had told her over the telephone that he would be down to his office in a half hour or so. Vaughn then suggested a Coca Cola while waiting for Mr. Dietz, saying he would then attend to his own business. She and Vaughn then went to a bar on 10th Street called the ''Ship,'' where she had a Coca Cola and he had a ''Tom Collins.'' After talking for a while, she told Vaughn that she was going on and that when he got ready to go back home, to come to Mr. Dietz's office. When she and Dietz had completed their conference, Mr. Vaughn had not yet arrived. She told Mr. Dietz her brother-in-law was to call for her and take her home. After waiting until about midnight and Vaughn had not yet arrived, Mr. Dietz accompanied her to the bus station and stayed until time for the bus to leave. She did not see Mr. Vaughn that night after going to Mr. Dietz's office.

Defendant stated that before this divorce case was tried she went with the plaintiff to the apartment of Mr. Dietz, and in her presence Mr. Dietz told plaintiff all that had taken place between the time she came to his office and the time she left on the bus, and Mr. Dietz invited plaintiff to come to his office the next day to see the minutes of the union and his memoranda of the conference to verify his statements.

Defendant described a second call at her apartment by Mrs. Vaughn, and said that while defendant was sitting by her window she saw Vaughn cross the street from the garage and come towards her door, but that there was a barber shop below the apartment, and she presumed he went in there. About fifteen minutes later Mrs. Vaughn came to her apartment and demanded to know where Mr. Vaughn was. Defendant replied that he was not there. Mrs. Vaughn then looked around the apartment and was unable to find her husband there. She left and came back a few minutes later and was very angry, and exclaimed that her husband had told her that he had been with the defendant to Kansas City, and that it was not the first time he had been with the defendant, but had also been with her when Mrs. Vaughn was in Arkansas, and at St. Louis. Mrs. Vaughn said that her husband had told her about all these times. Mrs. Vaughn was in a rage, walking up and down the living room and saying ''very nasty things to me,''

and defendant told her that if she did not leave, defendant would get somebody to throw her out.

Defendant, generally, denied that she had ever offered her husband any indignities or had ever become infatuated with any other man, taken any trips with other men, or improperly conducted herself with any man, and said that she was unaware of any embarrassment or humiliation caused her husband by her conduct.

Upon being asked about plaintiff's drunkenness, objection was made that she had condoned any such conduct by having testified that she was entirely satisfied with plaintiff up to the time the suit was filed. The court sustained the objection, and stated that upon her own testimony she had condoner the acts she complained of. Defendant's counsel offered to prove by witness frequent drunkenness on plaintiff's part, and that she had frequently protested against it. The offer was refused. The Court, however, permitted her to testify that plaintiff's own story about getting drunk, and the frequency of so doing, was substantially true, and that she disapproved of it and protested against it. She said the plaintiff did whip her once as he described, but said, "Well, I expect I needed the whipping." Her counsel undertook to show by her that plaintiff was given to pouting and having his way in all marital matters, and objection thereto was sustained. Offer was made to the same effect, which the court refused. Likewise was the offer to show by witness that plaintiff cursed defendant. She reiterated that she had no charge against him up to the filing of this suit, and wished to continue to live with him.

Defendant stated that on account of Mrs. Vaughn's request that nothing be said about the trouble to the plaintiff, she refrained from writing him about it in her letters until he had graduated. She felt that if he should fail to pass his examination that it might have been due to her writing him about the matter. She said she expected to tell him when he got out of the training school. She testified that they had no trouble during her visits with him while he was in the service. She explained that the manager of the company employing her did not attend the trial because of business matters that necessitated a trip to New York at the time. She added that prior to Mrs. Vaughn's call on her in June, 1944, she had never heard of the charges made.

Earl Dietz, in behalf of defendant, verified defendant's testimony as to the time she spent in his office on June 27, 1944, on business of the labor union; that the defendant was shop steward in the union, and it was necessary for her occasionally to confer with him as business agent and union attorney. When plaintiff and defendant called at his office witness showed plaintiff his own memorandum of the conference and the union records reporting the same. His memorandum read: "June 27, 1944, had conference with Mary Ellen Scott regarding George Osborne seniority at Old Weston Distillery. July 7,

1944, met with Mary Ellen Scott regarding matters at Old Weston. July 12, 1944, had conference regarding McPike Labor Board case." The union minutes were shown to plaintiff, making reference to the report by witness of the conference. Witness stated that over the past three years he had frequently had committee meetings where defendant was present; that she always conducted herself properly and after the meetings, went to her home. He stated that plaintiff bore a good reputation and was a fine man so far as he knew. He said he did not see Vaughn on June 27th, or any other time, and was not acquainted with him. He did not know of his own knowledge that Mr. Vaughn brought the defendant to Kansas City on June 27th.

In rebuttal, plaintiff testified that he did not have any way of knowing the particular date that Vaughn spent the night in Kansas City, and the 27th of June was the date given by Vaughn when confronted with the matter by plaintiff.

At the end of the taking of the testimony and before the formal decree was entered, the court said;

"Under this evidence and under this record I do not think there is anything for this Court to do except to grant this officer a decree of divorce. It is most unfortunate, a thing he might have forgiven her for, but he has not seen fit to do so. She has considerable of my sympathy, and I have considerable contempt for the man who testified against her. Nevertheless, I think it is natural she should deny it; but I do not believe the denial. Decree of divorce to plaintiff; additional suit money $53.55; additional attorney's fee $100.00."

In behalf of the defendant, counsel introduced plaintiff's deposition and offered certain parts thereof wherein plaintiff refused to answer questions, which, are set forth in a motion to dismiss plaintiff's petition, hereinafter more particularly considered. In this connection it was agreed that following the refusal to answer the questions mentioned, plaintiff did disclose the names of the parties involved, and the acts complained of, which were the subject-matter of the questions which plaintiff had refused to answer, and that defendant was permitted to take the depositions of the parties before trial; that the date of the refuseal to answer the questions was January 11th; that thereafter the depositions of Walter Vaughn and Mrs. Vaughn were taken on January 16th, to which they made their voluntary appearance; that during the interim Mr. Vaughn, together with counsel for plaintiff, came to the office of defendant's counsel and stated that there would be no other evidence offered at the trial than that of Walter Vaughn as to specific acts, and the evidence of Mrs. Vaughn as to what the claimed admissions of the defendant were, and that such stipulation had been complied with by the plaintiff.

Appellant's first assignment of error is the court's refusal to dismiss plaintiff's petition for failure to answer questions propounded to him in his deposition. After having testified that he had based

his petition on information of other parties, he was pressed to tell what these "rumors" were, and the sources of the same. With a few exceptions, these questions, forty or more, called for hearsay evidence as to what these "rumors" were, and from whom they emanated. Plaintiff, on advice of counsel, refused to answer them. Of course, such refusal would not justify the penalty of the statute (R. S. Mo., 1939, Sec. 1894). See In re Green, 126 Mo. App. 309, 103 S. W. 503. The few remaining questions which plaintiff refused to answer, such as how and why plaintiff was humiliated and embarrassed, were so closely related to the hearsay evidence of which plaintiff said he had no direct knowledge, that the court could, in its discretion, reasonably refuse to apply the penalty for plaintiff's refusal to answer the same. Plaintiff did subsequently furnish the names of the two persons from whom the information came on which he based his petition, produced the principal witness for deposition, and stipulated that no other witnesses would be used to substantiate the charges. This stipulation was complied with. Ten days thereafter elapsed before trial. The court did not abuse its discretion in refusing to strike plaintiff's petition.

The second assignment of error is that the court erred in granting a divorce to plaintiff because the evidence was insufficient to support the decree, in that (1) the facts testified to by plaintiff's witnesses were contrary to human experience, (2) plaintiff's evidence was vague, uncertain, contradictory, unsubstantial, and incredible, (3) defendant's alleged confession to witness Mrs. Vaughn was insufficient in face of appellant's denial, and Walter Vaughn's testimony was vague, incredible, and contradictory. The trial court heard and saw all the witnesses in the case. From what the court said at the close of all the testimony, and before entering the final decree, it is evident that it took into consideration all the complaints here made by appellant as to the character of the testimony. We are not in a position to point out any part or parts of the testimony tending to support the decree which are so improbable and contradictory as to be wholly unworthy of belief. The matters referred to are material issues in the case. Plaintiff's evidence, if believed by the trial court, was sufficiently substantial to support the decree. The trial court found the issues against the defendant, and for the plaintiff. Under the circumstances shown of record, we believe it our duty to defer to the finding of the trial court. See Woods v. Woods, (Mo. App.) 90 S. W. (2d) 1070.

The third assignment of error is that the respondent connived with his relatives in connection with appellant's alleged misconduct, thereby consenting thereto, and, therefore, is not the innocent and injured party. This, likewise, goes to the credibility of the witnesses and the weight of their testimony and on the record before us we defer to the finding of the trial court on this issue of fact.

In appellant's fourth assignment she charges that respondent was guilty of acts which would entitle appellant to a divorce because of indignities toward her, and because of his self-confessed drunkenness, and that the court erred in not dismissing plaintiff's petition on such grounds. For the same reasons assigned in our ruling on the second assignment of error, we defer to the finding of the trial court on this issue.

Appellant's fifth and last assignment is that the court erred in refusing to permit appellant to introduce evidence of respondent's indignities toward her during their married life, whether on the ground of condonation or otherwise, because the burden of proof was upon respondent to prove he was the innocent and injured party, and because condonation was not involved and, if it were, the offenses were revived by respondent's subsequent violations of his marital duties. Defendant, in direct examination, had been asked: "Are you entirely pleased and happy with your marital relationship and marital status up to this very instant?" To this she answered: Yes, sir." Defendant's counsel later asked her about the extent of plaintiff's drunkenness. Objection was made that she had testified that she was satisfied with defendant's character up to the time of the divorce action. The court sustained the objection, stating that defendant had condoned such conduct. Later, however, the court permitted her to answer, and she said that respondent's own testimony regarding his drinking was substantially true, and that she had protested. Her counsel then asked her about the "paddling" or "whipping" incident and she said it did happen, and that she continued to live with plaintiff thereafter but "I expect I needed the whipping." She did not say plaintiff made any promises following the incident but that, as usual, she "gave in" to plaintiff's argument. At this juncture defendant's counsel asked her about plaintiff's "having his way and pouting." Upon the same objection the court refused to permit her answer, and, on the ground of condonation, denied an offer of proof on the same subject. A similar offer was made as to plaintiff's alleged cursing and orally abusing defendant, which offer was also denied. As to all other countercharges in her answer, she had been permitted to testify.

On cross-examination the following immediately ensued:

"Q. So that there may be no misunderstanding about it, Mrs. Scott, I understand your testimony is that up to the filing of this suit your marital status had been satisfactory with you and that you wanted to continue to live with your husband? A. Yes, sir.

"Q. You are making no complaint about his character or his treatment of you as his wife over this period of time up to the filing of this suit? A. No, sir; I have no charge against him except this case right here now.

"Q. This is the only thing that you think your husband has done

wrong, filing this case? A. I won't say that. Like all married couples, we have had our quarrels.,

"Q. Subject, of course, to the normal married life over a period of eleven or twelve years? A. I would say that I still want to live with him, yes; I love him."

Appellant had pleaded the indignities referred to, among others, and while not asking for affirmative relief, had the right to introduce evidence pertaining to them as tending to show that plaintiff was not the innocent and injured party. We do not believe the evidence is sufficient to constitute condonation of the particular indignities in question by her continued cohabitation with plaintiff, especially in view of their nature. [Weber v. Weber, 195 Mo. App. 126, 189 S. W. 577; Arnold v. Arnold, (Mo.) 222 S. W. 996.]

The reason assigned by the court for the refusal of the testimony was not substantiated, but the reason suggested, in effect, by the objection as made, namely, that defendant admitted on the stand that she had no complaints to date of plaintiff's treatment of her as his wife, requires further consideration. While in her answer she alleges that the indignities, including those referred to—". . . rendered her condition in life intolerable," yet when her offer of proof of plaintiff's pouting, sulkiness, reticence and cursing were denied, she forthwith disclaimed any substantiality of such charges. Appellant is in no position now to urge again that these complaints as to which she was not permitted to testify were substantial and material. Whatever the reasons assigned by the court for exclusion of this testimony, appellant by her own testimony so characterized the subject-matter thereof as to make its exclusion harmless.

The decree and judgment of the trial court is affirmed. It is so ordered. All concur.