GEORGE ALBERT HILBERT *v.* EDNA GERNAND HILBERT

[No. 26, January Term, 1935.]

*Decided April 3rd, 1935.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*Watson E. Sherwood,* with whom was *Charles Lee Merriken* on the brief, for the appellant.

*G. C. A. Anderson,* with whom was *Clagett Bowie* on the brief, for the appellee.

SHEHAN, J., delivered the opinion of the Court.

This is an appeal from a decree of Circuit Court No. 2 of Baltimore City, granting unto Edna Gernand Hilbert, the appellee, a divorce *a mensa et thoro* from her husband, George Albert Hilbert.

On February 5th, 1934, a bill of complaint was filed by the appellee praying for a divorce *a mensa et thoro,* and

for permanent alimony, alimony *pendente lite,* and counsel fees, and for an accounting for such personal property, belonging to her, as the defendant has in his actual or constructive possession, and for general relief.

Edna Gernand Hilbert and George Albert Hilbert were married October 27th, 1925. They lived together in Baltimore City until July 15th, 1933, when the complainant left her husband because of alleged cruelties. There were no children born to them, but Mr. Hilbert had a son by a previous marriage, about seventeen years of age, who resided with them. Mrs. Hilbert had been previously married.

In her bill of complaint, in substance, the plaintiff alleges that her conduct towards the plaintiff has always been faithful, affectionate, and chaste, and that her entire behavior has been above reproach; that the defendant, with the intention of breaking their marital relations, had, for a long time prior to July 15th, 1933, conducted himself towards the plaintiff in such a manner that she, through fear of bodily harm and physical violence, was forced to leave him, and that this separation occurred on or about July 15th, 1933; and "that among other things the conduct of the defendant towards the plaintiff consisted of threatening and abusive language, threats of physical violence and actual physical violence, to such an extent as to cause the plaintiff to be fearful and apprehensive of her own safety." She further alleges that the conduct of the defendant towards her constitutes an abandonment and desertion of her by the defendant and is deliberate and final, and the separation of the parties is beyond any reasonable expectation of reconciliation. There are other allegations in the bill concerning property rights, and a statement of the financial ability of the defendant.

In his answer the defendant specifically denies acts of cruelty, undertakes to explain his ownership of the property, and his income; alleges that the plaintiff left him without just cause or provocation. He charges that he has invited his wife to return to him and that she has refused to do so, and on the 17th day of October, 1927, and

prior to their marriage, the parties entered into an agreement with respect to their property, providing "that if unhappy differences should arise between the parties resulting in a separation, no claim or demand shall be asserted or attempted to be asserted by either against the other for alimony, counsel fees or the like."

Testimony in the case was taken in open court. On the 24th of September, 1934, a decree was passed granting a divorce *a mensa et thoro* to Edna Gernand Hilbert from her husband and ordering the defendant to pay her twenty-five dollars per week as alimony. The property rights and counsel fees were held for further consideration. From said decree, this appeal was taken.

The marriage of the parties did not prove to be happy. After the first six or twelve months, serious differences arose between them, and for a number of years these differences became more frequent, culminating into tirades of abuse, and then into acts of cruelty and oppression, in which numerous assaults were made by the defendant upon the plaintiff, extending over a long period, all of which is charged by the complainant and all of which is substantially and satisfactorily corroborated by a number of witnesses.

To review in detail that part of the testimony relating to these numerous assaults, tirades of abuse, and serious difficulties which extended down to the time of a trip to Florida, and after Mr. Hilbert's return from Florida and Chicago to the time of the actual separation, would serve no good purpose.

The facts in this case divide themselves into two classes, those which occurred prior to and during a trip to Florida and to the Century of Progress at Chicago, and those that occurred after Mr. Hilbert's return to Baltimore from these trips, and down to the time of their separation.

There is no testimony in the case as to the actual striking or beating of the complainant between the time of Mr. Hilbert's return to their home and the time she left him, although there is testimony with corroboration as to his

tirades of abuse, violence of conduct, and threats during this period. There is no doubt that the treatment received by Mrs. Hilbert prior to his starting upon his trip to Florida, which lasted some three and a half months, would have justified her in leaving their home and seeking a divorce. The important questions in this case, which require consideration, arose while Mr. Hilbert was on his trip to Florida and Chicago, and after he had returned home, and before the separation. In this connection there are two questions of importance:

First. The effect upon this litigation of the numerous letters of encouragement, hope, and affection written by the complainant to the defendant during his absence in Florida and elsewhere.

Second. Whether the demeanor and actions of the defendant towards the complainant, after he had returned home, taken in connection with all the facts in the case, justified the complainant in leaving him, and bringing this suit.

Considering these questions in their order, the record shows that, during Mr. Hilbert's absence of approximately four months Mrs. Hilbert wrote about thirty-six letters to him. Three and a half months were spent in Florida and about two weeks in Chicago and elsewhere. All of these letters contained many expressions of endearment, hope for their future happiness and welfare together, assurances of helpfulness, and a willingness to make sacrifices upon her part. In general terms, this describes the character of the numerous and lengthy letters sent to him while he was away from home. The contention is made that such letters are inconsistent with the facts as testified to by Mrs. Hilbert. It is contended by the defendant that no person who had received at the hands of another such brutal and cruel treatment as she claims she had experienced could possibly entertain such feelings of devotion, and give expression to such sentiments, as were contained in her letters, and that the conclusion is that no such cruelties had in fact ever been inflicted upon her.

Mrs. Hilbert's answer to this contention is that she was doing everything in her power to bring about a satisfactory state of affairs in their home when he returned, and to give him all possible encouragement and help to accomplish this. Such was the purport of her testimony. A question by counsel, and an answer by Mrs. Hilbert, describes this situation fairly and comprehensively: "Q. If Mr. Hilbert treated you in the manner you have described prior to his leaving for Florida why did you write him such perfectly splendid letters as these letters are? A. Before Mr. Hilbert left, for several days he was very, very sweet and kind to me. He begged and pleaded with me to forget, to excuse all the different things he had done; said he would go to Florida and take care of himself, he would not drink; that while he was gone I could look for a little house in the country that I had always wanted; he was going to come back and our lives would be—were going to be what I hoped it would be. So when he left for Florida, I gave him every bit of encouragement that I could possibly give him, and Mr. Sherwood, you yourself know I wanted to take my own money to pay the bills that were outstanding, so he would come back and there would be nothing in the world to upset him."

Corroborating, explaining, and amplifying this testimony, it appears that, shortly before Mr. Hilbert went to Florida, there was a conference held, at which were present Mr. Carman, Mrs. Hilbert's attorney, Mr. Sherwood, Mr. Hilbert's attorney, and Mr. and Mrs. Hilbert. At that conference the situation of the parties, both as to property and as to their domestic relations, was discussed and considered. Mr. Hilbert's testimony as to the subjects covered at this meeting was at variance to that of Mrs. Hilbert, but he finally admitted, when closely questioned by the chancellor, that their marital relations were considered. Mrs. Hilbert testified that they were discussed, and Mr. Hilbert admitted at that time that he had struck her. This statement upon the part of Mrs. Hilbert was not denied by any one. Mrs. Hilbert testi-

fied, "After that conference it was decided on a divorce." Then Mr. Hilbert begged and pleaded with her not to do this, and he decided to go to Florida for a rest and vacation. He told her he would take care of himself and come back and things would be entirely different. To this she seems to have assented, and to aid and encourage him she declares she wrote the letters and hopefully awaited his return, and the fulfillment of his promises. Her conduct seems to have been impelled by a sincere desire to re-establish their home upon a less pretentious plan, with the renewed purpose of going forward in life in a better and happier course. This explanation, we think, is a sufficient answer to the contention of the defendant that no person who had been treated so cruelly as Mrs. Hilbert claims to have been treated could have written such letters to the person charged with such cruelty. In the failure of the Park Bank, of which Mr. Hilbert was a director, he had passed through a most severe strain. Mrs. Hilbert recognized this and the letters show a desire to encourage and to be helpful to him, and in that behalf her attitude was commendable, and indicates her desire to live with him and not to be separated from him, and her leaving the home must have been actuated by serious and compelling causes.

The law favors condonation and forgiveness, because these are the means by which people may be reunited or deterred from separation and resorting to the courts in cases such as this, and Mrs. Hilbert should not be penalized for doing that which is favored by the law, and the presumption of good faith should be accorded to her. *Fisher v. Fisher,* 93 Md. 298, 303, 48 A. 833, and cases cited.

The second matter, as above indicated, which should have special consideration in this case is the question: Did the conduct of Mr. Hilbert, after his return from Florida and the Century of Progress, justify her in leaving him and seeking the relief prayed for in the bill? Mrs. Hilbert's course of action in forgiving and condoning the past offenses of her husband, and his direct prom-

ises of reformation, immediately before he went to Florida, and her letters to him while he was away from home, certainly raise a presumption that she hoped and expected that his promises would be fulfilled upon his return. The forgiveness, and forbearance to sue, which he requested of her and which she gave, were based upon these promises. This is not questioned in the evidence.

Mr. Hilbert remained in Florida three and a half months.. It might be inferred that this was ample time for him to regain his health and strength, and to form a definite purpose of fulfilling his promises to his wife, and to fulfill those obligations to her that the law placed upon him in consideration of her forgiveness, and to create a desire to return to his home in Baltimore. Instead of this, he asked her to meet him in Washington, which she did, and from there they went to Virginia to visit relatives. During this visit his conduct towards her was agreeable and pleasing, but while in Virginia he concluded that he would like to go to the Century of Progress and attend to some business in that section of the country; therefore he and his son, who had been with him in Florida, took the car and set out for Chicago, Mrs. Hilbert returning to Baltimore by train. He stayed about two and a half weeks. She never heard a word from him, although she continued to write letters of endearment and hopefulness to him.

He returned home without advising her when he was coming, and she states that he met her with tirades of abuse, which continued over a period of eight days. Five of these tirades, as she testified, happened within that period and he resumed his old habit of drinking. He called her all manner of names, threw things at her, got drunk a good bit, and drove her to distraction. This is the purport of her testimony. At that time her health was not good. Dr. Galvin was attending her. In consequence of this treatment she states she was "simply physically and mentally worn down and could not stand any more." She does not charge him, during this time, with actually striking her, as he had often done in the past.

It seems that immediately upon his return, Mr. Hilbert did exactly those things he had promised not to do. Instead of taking up life in a better spirit, and pursuing a different course toward his wife, he resumed that conduct which in the past had preceded or accompanied his acts of violence towards her.

Mrs. Hilbert recognized this situation immediately, and had a right to infer that his conduct would be the forerunner of those acts of repression and cruelty which previously had been inflicted upon her. We think it was not her duty or obligation to remain longer with him, and to await a recurrence of those cruelties which she had formerly experienced. His promises, both expressed by him and implied by law, when she forgave him before he went to Florida, were broken; therefore his acts of cruelty in the past were, by operation of the law, revived, and may be taken as a part of the evidence in this case in determining her right to relief.

This conclusion is supported by authorities in this state and elsewhere. "Condonation is forgiveness, with an implied condition that the injury shall not be repeated, and that the party shall be treated with conjugal kindness; and on breach of this condition the right to remedy for former injuries revives." *Fisher v. Fisher*, 93 Md. 298, 301, 48 A. 833, 834, and numerous cited authorities; 2 *Greenleaf on Evidence*, sec. 53.

The doctrine is well established that a lesser offense, or a failure to observe and practice conjugal kindness, will serve to revive more serious offenses that have been condoned; a revival of misconduct does not depend upon a repetition of like or more serious offenses; for example, misconduct constituting a just cause for separation will revive a condoned cause for absolute divorce. Cruelty is a breach of the implied condition of condonation and will revive the charge of adultery. *Fisher v. Fisher, supra,* and citations. It is held that acts in themselves not sufficient to support or justify the granting of a divorce may be sufficient as a waiver of the condonation and to revive the alleged offense. In 2 *Bishop on Marriage, Divorce*

*and Separation,* sec. 308, it is said: "All condonation, especially implied, is upon the condition that the offense shall not be repeated, and likewise that continually afterwards the party forgiven shall treat the other with conjugal kindness, whereupon the breach of the condition revives the original right of divorce."

In the case of *Johnson v. Johnson,* 14 Wend. (N. Y.) 637, where the husband's adultery had been condoned by his wife, the condonation was destroyed by the husband's subsequent neglect to attend to her comfort, by insulting her by opprobrious epithets, and by pursuing a course of conduct towards her calculated to wound her feelings, although no subsequent adultery or even acts of violence are charged.

In *Robbins v. Robbins,* 100 Mass. 150, it was said that when the wife had condoned the husband's cruelty by cohabiting with him after it was inflicted, but the husband, very shortly after the condonation of his past, for six weeks refused to speak to her, though living in the same house, the condoned cruelty was revived. The court said that such evidence of persistent unkindness and ill temper warranted the wife and the court in inferring that his smothering anger would break out again into acts of cruelty. This doctrine is cited with approval in the case of *Fisher v. Fisher, supra.*

It follows that the conduct of Mr. Hilbert, after he returned from Florida, may not in itself be sufficient to constitute grounds for divorce, but nevertheless is sufficient to revive his former actions and misconduct, which had been condoned, and which do constitute sufficient grounds for divorce *a mensa et thoro.* His want of conjugal kindness, as evidenced by his abuse, threats, his throwing things at her, intoxication, and tirades of abuse, simply wore her down mentally and physically, so "that she could stand it no longer." Her physical condition, the result of this misconduct, has corroboration in the testimony of Dr. Galvin and Mrs. Sauerwein. The acts of cruelty having been revived after his return from his visit to Florida and Chicago, it is upon these earlier cruel-

ties that a right to a divorce is founded. Without going into extended detail, a review of these facts and of their corroboration should be given.

As is usual in such cases, the appellant denied acts of cruelty, but the testimony is that upon numerous occasions he struck her, and these acts extended over a long period of time. The results of such brutalities were bruises over various parts of her body. Her face, her limbs, and her body, at one time or another, showed distinctive marks of brutality. It has been testified that as a result of these acts she was nervous and in a terrified condition. Mrs. Crusse, a nurse, cared for her several times. Her sister, Mrs. Packard, testified that she had seen Mr. Hilbert strike and beat her on the stairs at their home. Mr. Norris corroborates some of these incidents, as does Mrs. Packard. On two occasions police were called by Mrs. Hilbert for her protection, and a number of times she was compelled to leave home for refuge with her own people. There were threats of violence to her, and upon one occasion he told Mrs. Sauerwein he would break her damn face. This is corroborative of the testimony that previous to this statement her face had shown marks of violence. His cruelties, as set forth in the record, and as corroborated by a number of witnesses, and by Mrs. Hilbert's condition after these outbreaks of passion and violence upon the part of Mr. Hilbert, are clearly indicative of the conduct of Mr. Hilbert towards his wife. The testimony of the defendant was brief and inconclusive. His evidence does not carry satisfactory force and effect. But two witnesses, Gertrude Hall, a servant in the family, and Mr. Hilbert's son by a former wife, were called by the defense. Mrs. Hilbert had testified that Gertrude Hall and the son had seen Mr. Hilbert strike her. Mrs. Hilbert is not supported in this, but the boy did say he had seen his father assume a threatening attitude towards his wife, and he had remonstrated with him, telling him he could not strike her in his presence. Gertrude Hall told Mrs. Hilbert (at least she did not deny telling her when she was on the stand) that she did not want to

testify for Mrs. Hilbert because she was afraid she would lose her position. She had a mother who was ill, and a blind father, dependent upon her. She had every incentive to protect her employer as much as possible. She had every commendable reason to desire to retain her position. The helplessness and dependency of a sick mother and a blind father, both of whom were doubtless advancing in years, were the strongest influences in shaping her testimony. The other corroborating witness, the young son, was to be pitied, and the court below suggested that he be not further examined, after testifying, as above recited, and that he had found his father under the influence of liquor at a hotel after he had disappeared for several days. Obviously, testimony of this character cannot be accredited with very much force. It seems that the appellee has fully met the requirements as to corroboration, and has also discharged her burden of proof in a most substantial and conclusive manner.

The parties to this suit undertook to enter into the antenuptial contract to which reference has been made, by the terms of which it is provided, in paragraph five: "In the event that unhappy differences should arise between the parties hereto, resulting in a separation between the parties, no claim or demand shall be asserted or attempted to be asserted by either party hereto as against the other for alimony, counsel fees or the like," etc. The appellant did not press this question in the Court of Appeals, or, it seems, in the lower court, and suffice it to say such contracts are held to be void as against public policy, and, as this contract has not been asserted as a defense, it requires no further consideration.

For the above stated reasons, it is the opinion of this court that the decree from which this appeal was taken should be affirmed.

*Decree affirmed, with costs to the appellee in this and the lower court.*