229 S.W.2d 7 (1950)
LOWE
v.
LOWE.
No. 21304.
Kansas City Court of Appeals. Missouri.
March 6, 1950.
Errol Joyce, Brookfield, Walter A. Raymond, Kansas City, for appellant.
*8 Marvin C. Hopper, Brookfield, for respondent.
BOUR, Commissioner.
Plaintiff was awarded a decree of divorce from her husband on July 20, 1948, and $30 a month for the maintenance of their infant child. The decree awarded custody of the child to plaintiff with visitation privileges to defendant. Motion for a new trial was overruled, and defendant has appealed. The petition alleged general indignities. Defendant's answer admitted the residence of plaintiff, the marriage and birth of the child, but denied all of the remaining allegations of the petition. The assignment of error is that the evidence is insufficient to warrant the granting of a divorce to plaintiff.
The record shows that both parties were born and reared in Brookfield, Missouri. Defendant enlisted in the army air corps on January 20, 1942. Following his release from the army he was employed from July 1945, to November 1945, as a flying instructor and earned about $150 a month. In November 1945, he sprained his ankle in an airplane accident and had to give up that position. Defendant then filed an application to return to the army air corps. He testified that he took the army physical and mental examinations on February 5, 1946, and that he was reasonably sure he would get the appointment. Defendant had his first date with plaintiff on January 1, 1946; they were married on February 28, 1946, about two weeks after he took the army examinations. Plaintiff's parents invited the couple to live with them while defendant was waiting to hear from the army in regard to his application for reinstatement, and the invitation was accepted on or about March 10, 1946. Defendant testified that at the time of the marriage he had $100 and an automobile, and owed his brother $400. The last week in March 1946, he was notified by the army that there was no opening at that time. He then sought work with two railroads and tried to get a job as pilot with one of the airlines, but without success. Finally plaintiff's father, a grocer, employed defendant to work in his store. He worked there from the last week in April 1946, to August 15, 1946, when he was employed by an oil company. From September 4, 1946, to April or May 1947, he was with that company as assistant manager of a filling station in Brookfield. He was unable to find an apartment to rent, and at the invitation of plaintiff's parents the couple continued to live with them until April or May 1947. The child was born in Brookfield on November 12, 1946.
In April 1947, the defendant leased a filling station at Gallatin, Missouri. The only accommodation the couple could get in Gallatin was an undesirable three room unfurnished apartment over a store. Defendant borrowed money from plaintiff's parents to buy furniture for the apartment. He testified that business was "pretty fair" the first three months, but his competitors started a price war and he had to sell below cost or quit, so he gave up the filling station in September or October 1947.
A Mr. Snyder took defendant into his metal polishing and plating shop. They operated in Gallatin for a short time and then decided to move the shop to Kansas City. Plaintiff made several trips to Kansas City with defendant to look for a house and they finally found one which they decided to buy. Plaintiff wrote a letter to defendant's aunt and obtained a loan of $300 which was used to make a down payment on the house, but the mortgage loan was not approved and they were unable to acquire the property. Plaintiff returned to Gallatin and late in November 1947, defendant took plaintiff, their child, and furniture to the home of plaintiff's parents in Brookfield. Defendant then went to Kansas City with Mr. Snyder, and plaintiff continued to live with her parents. In December 1947, the plaintiff secured a position in Brookfield at a salary of $140 a month. Late in January 1948, the defendant and Snyder moved their shop from Kansas City to St. Joseph. Defendant testified that about the time they got established in St. Joseph their place of business burned. The suit for divorce was filed March 27, 1948. Defendant testified that at the time of the trial he was employed *9 as a cab driver in Kansas City, and had filed another application for reinstatement in the army.
One charge in the petition is that defendant was indolent, lacking in initiative and ambition, and made no effort since marriage to obtain regular employment; that he failed and refused to support plaintiff and their infant child. As stated above, plaintiff and defendant lived with plaintiff's parents from March 10, 1946, to April or May 1947. From March 10, 1946, to the last week in April 1946, the defendant was not employed but he received $20 a week under the GI Bill of Rights and contributed "a little" to the household expenses. He worked in the grocery store from the last of April 1946, to August 15, 1946, and plaintiff's father paid him $20 a week and furnished room and board for him and plaintiff. During the period from September 4, 1946, to April or May 1947, when defendant was assistant manager of the filling station at Brookfield, he earned $190 to $196 a month and paid $60 a month for room and board. Plaintiff testified that during the period when plaintiff and defendant lived with her parents the defendant did not buy her any clothes or give her any money for her personal needs, but that he spent money for fishing tackle and repairs on his automobile. Defendant testified that during this period he gave plaintiff money for "cosmetics and cokes" but he could not say how much; that he paid the premium on his life insurance and bought "incidentals" after plaintiff became pregnant, but he did not state the amount of such expenditures. He also testified that he paid the doctor $75, the nurse $63, and the hospital (amount not stated) for services rendered in connection with plaintiff's confinement and her later operation.
Plaintiff testified that when they lived in Gallatin the defendant gave her "around" $1 a day to buy groceries for three meals, and that sometimes she had less than $1 a day for living expenses; that sometimes she did not have money to buy milk for the baby and on such occasions the baby cried in the night because she was hungry; that her parents had to send them food "a lot of times"; that she thought he had more than $1 a day to give her; that while defendant had to buy equipment for the filling station, he also bought a motor for his automobile and had a lot of work done on it; and that defendant went fishing and "always had money for fishing tackle, new flys and fly rods." She also stated: "I didn't have much to wear, we didn't have any money for awhile I think I was going barefooted." * * * "There was a time when I didn't have any shoes to wear around the house except my high heels." When plaintiff was asked whether defendant furnished her with money while he was trying to get started in the metal plating business, she said: "No, he didn't have any, * * * he borrowed some money, but my folks had to help me with most of it." When asked whether defendant ever refused to give her money when she knew he had it, she said: "I never knew whether he had any money or not." Plaintiff identified two cancelled checks, one for $10 dated November 24, 1947, and one for $20 dated November 28, 1947, payable to her and drawn by defendant on a Gallatin bank, but she could not remember whether they were given to her before or after she returned to Brookfield. She said that she had not received any money from her husband since December 1947. She admitted, however, that defendant worked hard while they were in Gallatin.
Defendant testified that "it is true I only left maybe a dollar or two with her, other occasions when I left her $10, but I made every effort to give her money. Practically everything I made went for our support, and what little I could spare I put into equipment, because the station was very poorly stocked." * * * "If there was ever a time that baby went hungry I didn't know it." Defendant testified that there were times when plaintiff went barefooted "because it was hot and for no other reason." He denied that he bought fishing tackle, but did not deny that he spent money on his car. He testified that he took care of his family to the best of his ability, but admitted that he had contributed "very little" in the three or four months before the trial.
*10 Plaintiff testified that she left Gallatin and returned to Brookfield because of defendant's inability to support her and the child; that he told her to get a job and she had no choice in the matter. Plaintiff's mother testified: "He just brought her home and he thought it would be well she took a job." Defendant stated that plaintiff insisted that she stay with her parents until the loan on the house in Kansas City was approved. "I never at any time asked her to work; she insisted that she work."
Another charge in the petition is that defendant became cold and neglectful towards plaintiff and their child; that he manifested no interest in the child and never purchased anything for the child. As stated above, the child was born in Brookfield on November 12, 1946. For the purpose of showing that defendant took no interest in her condition before the child was born, plaintiff testified that she wanted to go to a doctor when she became pregnant, but that she did not see one until after she had been pregnant about five or six months, and she had to make the arrangements with the doctor; that as the time approached for the birth of the child defendant did not make any arrangements with the hospital. One night it became apparent that she would have to go to the hospital. Defendant had been hunting and when he got home he went to bed, although plaintiff was sick at the time. Later that night her mother called the hospital. Defendant was "slow" in getting up, but he took her to the hospital and the child was born fifteen minutes after she got there. Defendant testified: "I allowed Dorothy the privilege to select her own doctor, she decided on the doctor, so she arranged. I just paid him $75 during her period of pregnancy and just following. * * * I worked that afternoon, didn't get off until four o'clock and when I got home my wife experienced her first pains. She had seen Dr. Benesack, he didn't want her to come up yet. She didn't experience any further pain. I had already gone to bed, later I got up and dressed" and took her to the hospital. Defendant said that he visited plaintiff at the hospital every day and sent her a dozen roses. Plaintiff testified that when she had to go back to the hospital for an operation the defendant was working or fishing and her brother-in-law had to come from Marceline to take her to the hospital. Defendant denied this. He said that he arranged for the ambulance and a private nurse, and that he was at the hospital "all day long" the day of the operation. Plaintiff said that her child was ill at the time, but defendant did nothing to secure medical aid for the child, and her parents and sister had to arrange for such aid. The doctor and nurse who cared for plaintiff testified that defendant was "very nice" to plaintiff and that his attitude towards plaintiff was "normal."
Plaintiff testified that defendant never helped her take care of the baby; that he never bought anything for the baby; that on one occasion when plaintiff was ill defendant would not lift the baby for her; that when she went any place with defendant he would not carry the baby, and mentioned one such occasion when they were in Kansas City; that he made her carry furniture upstairs although she was wearing an internal brace at the time, and that she did so because he screamed at her and she was "scared to death of him"; that while she was wearing an internal brace he never assisted her in opening doors; that he slammed doors in her face and made her "carry all the groceries"; that "he would go off for days and stay fishing"; that after defendant went to Kansas City he did not remember her birthday or the child's birthday. She said he "should have been kinder; he should have been nicer." Defendant expressly denied some but not all of these charges. He said he never refused to lift the baby; that the only time he was in Kansas City with plaintiff he helped care for the baby; that he never "slammed the door in any woman's face." As to forcing plaintiff to carry furniture, he denied the charge and said that when they moved the plaintiff carried some light boxes, but a neighbor and a truck driver carried the furniture. He said that he did not remember the birthdays because plaintiff told him not to *11 correspond with her. He also testified that he did not know that his wife ever wore an internal brace.
Plaintiff's mother testified that she never saw defendant show "any devotion or love, he was contrary during the whole time he lived there." She said: "He didn't help with the baby at all, the baby wasn't sick, but naturally I was nervous, I had no help and Warren didn't think it was necessary, he said his mother had seven, she didn't have a doctor with some of them. So I tried to take care of the baby myself, and it was hard because Dorothy had complications * * *." Plaintiff's mother also testified that on the occasion mentioned above when plaintiff was sick, the defendant would not lift the baby; that when plaintiff was pregnant she wanted to go for a drive and defendant refused to take her, and "she told me then she didn't love him, she couldn't put up with it much longer." Plaintiff testified that after she had been married about three months, she told defendant that she did not love him and wanted to "call it off" but defendant begged for another chance.
The evidence shows that after defendant went to Kansas City he came back to Brookfield almost every week end until January 1, 1948, when plaintiff told him she was through and requested him to stay away. Defendant testified that he loved his wife and baby; that after he went to Kansas City he came to see the child every time plaintiff would let him; and that he "asked her what more I could do to make a reconciliation, what I could do to make things right, she said the best thing I could do was not come back."
The petition also alleged that defendant was a war veteran who found it difficult to adjust himself to civilian life; that he told plaintiff many times he never should have married. The evidence shows that defendant was a war veteran, and it may be that he found it difficult to adjust himself to civilian life. Even so, it can hardly be said that this shows any dereliction of marital duty on the part of defendant. The only proof of the charge that defendant stated many times that he should not have married was the testimony of plaintiff that in the presence of her parents defendant said "he wasn't ready to get married, was far in debt, should have waited until he had a job." We agree with the counsel for defendant that the statement was not an indignity within the meaning of the statute. Defendant merely said that he was not financially able to get married at the time he did marry. The evidence of both parties shows that the statement was true.
Another charge in the petition is that defendant was an introvert, having no consideration for the feelings of other persons; that on numerous occasions while living in the home of plaintiff's parents, he was unfriendly and obnoxious to their guests and friends; that while plaintiff and defendant were residing in Gallatin, defendant made no effort to make friends, and was abusive to the friends of plaintiff. Plaintiff testified that when she was pregnant the defendant "made fun" of her appearance in the presence of her mother.
"Q. Was that in a spirit of gesture and you just took it to heart? A. No, it wasn't. * * * He often made fun of it, I was fat and everything. * * *
"Q. You took that as an offense? A. Usually the way it was made. * * * He has insulted me a lot of times in front of guests." This testimony was not expressly denied by defendant. As to defendant's treatment of plaintiff's friends, she testified that "he left once and went some place, on the whole he treated them very cool." As to defendant's treatment of her parents' friends, the plaintiff said: "Well, he was very rude, he wouldn't even speak to them when any of my friends or parents' friends came in, sit and read a newspaper without speaking." Plaintiff's mother testified that once when her brother was there she asked defendant to get dressed, but "he sat there in one of our best places, without changing his clothes, * * * we felt terribly sorry for Dorothy." She also testified: "We had a lot of relations, both of my nieces had recently married and they brought their new husbands there and Skeet (defendant), he never spoke to them.
*12 I remember one time Mr. Glanter came, he never took the paper down from his face, it was very embarrassing. He would just sit there in the room and embarrass us all to death." Defendant did not deny these charges. He testified that while he lived with plaintiff's parents "there was a tenseness there all the time and I felt it. * * * There was quite a bit of resentment in my staying there." Defendant told of a conversation with plaintiff's mother about two months before the trial in which she said: "She told me she never approved of my marriage to Dorothy, didn't approve of my background and she thought I was inferior to Dorothy."
The petition alleged that defendant refused to take plaintiff to any place of amusement, and steadfastly refused to accompany plaintiff to church. Plaintiff testified that defendant would not take her to any places of amusement; that the only place he took her while they lived in Gallatin was a beer tavern where she did not want to go; that on two occasions plaintiff's sister and her husband planned to take plaintiff and defendant to dinner, but defendant refused to go. Plaintiff stated that "he never wanted to clean up. He didn't want to shave or wash. He just stayed home, laid around, he didn't want to shave or wash." Plaintiff also said that defendant refused to accompany her to church. Defendant testified that he did not recall any invitations to dinner that he did not accept; that he took plaintiff on three vacation trips to the Ozarks; that he took her to Casa Grande, to shows, weiner parties, and a dance; that they had several all-day outings at Ethel Lake with members of plaintiff's family, and went to Chillicothe and several other places with friends. Defendant testified: "We attended church together here in Brookfield numerous times, there were occasions when I had to work late at night, had to work the next day, I didn't have any time. There wasn't any disturbance over the matter."
The petition also alleged that defendant was ill-tempered and was subject to fits of temper and rage, and on numerous occasions yelled at and cursed plaintiff. There was no evidence that defendant ever cursed plaintiff. Plaintiff testified that when she played bridge with defendant and guests in the home "he would get mad, get mad at me and scold me until I would end up a nervous wreck crying and I would have to quit playing." Plaintiff's mother said: "One night I remember along about eleven o'clock why we could hear Warren just laying her out. She hadn't played according to Blackstone. She began crying, of course, the guests got up and left without refreshments or anything." Defendant testified: "In so much as she was learning to play bridge she did make a lot of mistakes." As to the mother's testimony, the defendant said: "I don't think there was anything like what she testified to, there were occasions, a time or two, I did raise my voice to my wife, but I didn't insult her in reference to a game of bridge." Defendant also said that he and plaintiff had never had anything more "than friendly arguments, never had any fights or anything like that."
The last charge in the petition is that defendant often developed sullen moods; that he refused to discuss problems and plans with plaintiff; that in August 1946, defendant became angry through no fault of plaintiff, and refused to speak or converse with plaintiff for three days. As to the incident alleged to have occurred in August 1946, the plaintiff testified: "He just became moody. * * * He wouldn't speak to me for three entire days." This was not denied by defendant. Plaintiff also stated that defendant would not discuss his business affairs with her. However, the record shows that plaintiff knew of defendant's plan to move to Gallatin. She testified that she was sick at the time, and that defendant took over the job of finding an apartment in Gallatin. The record also shows that plaintiff participated in the efforts to find a house in Kansas City when defendant wanted to move there.
The only question before this court is whether the evidence is sufficient to warrant the granting of a divorce to plaintiff. As to the charge that defendant was indolent and lacking in initiative and ambition, it has been held that lack of industry *13 is not of itself an indignity which justifies the granting of a divorce. Fite v. Fite, Mo.App., 196 S.W.2d 65, 70; England v. England, 225 Mo.App. 725, 732, 39 S.W.2d 429, 433. Furthermore, the evidence does not support that charge. The record shows that defendant did make an effort to secure employment and make a living, and plaintiff admitted that he worked hard when they lived in Gallatin. As to the charge that defendant failed and refused to support plaintiff and their child, it has been held that nonsupport, of itself, is not a ground for divorce in this state. Hess v. Hess, 232 Mo.App. 825, 829, 113 S.W.2d 139, 142, and cases cited. But the cases do not hold that evidence of nonsupport cannot be considered along with other evidence when general indignities are relied on as grounds for divorce. There is no hard and fast rule as to what words or acts constitute indignities rendering the condition of the injured party intolerable. Each divorce action based on general indignities must be determined on its own facts. While nonsupport is not of itself a ground for divorce, yet where there is evidence of nonsupport together with evidence showing dereliction of other marital duties on the husband's part, the evidence, as a whole, may disclose a consistent course of conduct by the husband of such character as to amount to a species of mental or physical cruelty whereby the wife's condition is rendered intolerable. In such case, the evidence of nonsupport may be considered along with the other evidence in the case. See Becker v. Becker, Mo.App. 155 S.W. 2d 904. Although plaintiff herein testified that she "never knew whether he had money or not," she also stated that defendant did not give her any money for her personal needs during the period when he earned about $190 a month and paid $60 a month for room and board, but he spent money for fishing tackle and repairs on his car. Defendant's testimony concerning his financial affairs during that period is not satisfactory in all respects. The record shows, however, that he paid the medical expenses incurred in connection with plaintiff's confinement and operation. Plaintiff testified that when they lived in Gallatin the defendant gave her about $1 a day for groceries and milk for the baby, although he always had money for fishing tackle and repairs on his car. Defendant denied that the baby did not have enough milk and that he bought fishing tackle. He said that he took care of his family to the best of his ability, and that when they lived in Gallatin "practically everything I made went for our support." If defendant spent money for his own pleasure when plaintiff and the baby did not have the necessaries of life, as plaintiff's testimony tends to show, such conduct showed an attitude of selfish indifference to the needs of his family. Whether or not the defendant was guilty of such conduct depends, of course, upon the credibility of the witnesses.
Plaintiff's testimony, if believed, also shows that defendant manifested little or no interest in her physical welfare during the period of her pregnancy or when she had to return to the hospital for an operation; that when she was pregnant he ridiculed her in the presence of others; that he never bought the baby anything; that he did not help her take care of the baby when she was ill or at any other time; that he made her carry furniture when she was wearing an internal brace; that he made her carry all the groceries; that he persistently slammed doors in her face; that he insulted her in the presence of friends, and scolded and criticized her when they were playing bridge with guests; that he made no effort to be pleasant to her friends or her parents' friends; that he would not take her to places of amusement and refused to accompany her to church; that on one occasion he refused to speak to her for three days; and that he would go away for days on fishing trips when she needed his help in caring for the baby. Defendant denied some but not all of these charges, as shown in our more detailed statement of the testimony.
While it is our duty, in an action for divorce, to review the case upon both the law and the evidence and reach our own conclusion, we may not set aside the judgment of the trial court "unless clearly erroneous, and due regard shall be *14 given to the opportunity of the trial court to judge of the credibility of the witnesses." Civil Code, Mo.R.S.A. § 847.114(d). We have studied the evidence in the case and are of the opinion that plaintiff's evidence, if believed by the trial court, was sufficient to support the decree in her favor. Some of the incidents related by plaintiff and her mother seem trivial; others are of much greater consequence. But plaintiff's evidence, as a whole, was substantial. It disclosed a consistent course of conduct on defendant's part extending over the twenty months' period of cohabitation, the cumulative effect of which may well have rendered her condition intolerable. As to the credibility of the witnesses, we defer to the finding of the trial court. Under the record, we cannot say that the judgment of the trial court was clearly erroneous.
Defendant contends that plaintiff is not entitled to a divorce because her case rests for the most part on her own uncorroborated testimony. There is no inflexible rule that a divorce will not be granted on the uncorroborated testimony of a party. This is a matter within the sound discretion of the trial court. Mistler v. Mistler, Mo.App., 202 S.W.2d 513, 515. We do not believe that the trial court abused its discretion in this case.
Defendant also contends that most of plaintiff's complaints were based on defendant's conduct before they moved away from Brookfield in April 1947, and that by living with him in Gallatin from April to November 1947, she condoned such conduct. However, the record also shows that many of plaintiff's complaints refer to defendant's conduct when they lived in Gallatin. Plaintiff's action is based on a series of wrongs rather than a single act such as adultery. In such a case, mere cohabitation during the period in which the wrongs were committed cannot be considered as condonation, in the sense in which it would be after an act of adultery; especially when, as in this case, the wife is the complaining party and the welfare of a child is involved. Scott v. Scott, Mo. App., 192 S.W.2d 668, 677, and cases cited; Bliss v. Bliss, 161 Mo.App. 70, 75, 142 S.W. 1081, 1082; 17 Am.Jur., sec. 210, p. 257; 14 A.L.R. 933; Hilbert v. Hilbert, 168 Md. 364, 177 A. 914, 98 A.L.R. 1353. "The patient endurance of ill-treatment is not only no bar to the wife's complaint, but creates no presumption against its truth." Guthrie v. Guthrie, 26 Mo.App. 566, 574.
For the reasons stated, the judgment should be affirmed.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.
All concur.