471 A.2d 705

Howard Linwood FREY

v.

Barbara J. FREY.

No. 53, Sept. Term, 1983.

Court of Appeals of Maryland.

Feb. 23, 1984.

Harry S. Shapiro, Towson (Marc H. Baer, Towson, on brief), for appellant.

Maureen O'Ferrall Gardner, Towson (Bregel & Bregel, Chartered, Towson, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

· COUCH, Judge.

We are presented in this case with whether the public policy of Maryland regarding antenuptial agreements, which contemplate separation or divorce, and by which a spouse, *inter alia,* has waived alimony, has changed since we last addressed the question. Because we believe public policy has changed, we will reverse the holding of the Circuit Court for Baltimore County and remand the case for further proceedings consistent with this opinion.

## I

### The Facts

On June 19, 1973, four days prior to their marriage, the parties entered into an antenuptial agreement. On June 23, 1973, they were married, and subsequently, three children were born. On November 5, 1981 Mrs. Frey, appellee, filed a Bill of Complaint for Divorce *A Mensa Et Thoro,* seeking alimony, child support, and other relief. Mr. Frey, appellant, responded raising preliminary objections to alimony and other property at issue based upon the antenuptial agreement.

The agreement was a two page document and provided, *inter alia,* that each party would retain sole ownership and control of all the individual property of each, which they presently possessed or thereafter acquired, as if the mar- ·riage had never occurred. The agreement further provided for a release and waiver of any claim for alimony *pendente lite,* permanent alimony, or support or maintenance of any kind, in the event of a separation.

At the time of their marriage, Mrs. Frey was age 22, a college graduate, and employed as a second grade teacher. Mr. Frey, at that time, was age 32, established in business, and possessed a substantially greater salary and bank ac- count. Conflicting testimony was presented concerning the execution of the agreement. Mrs. Frey did not recall ever signing such a document, and suggested that if she had signed the agreement, her signing was due to deceit. The

document, however, was notarized and sealed by a notary public. The circuit court found, supported by expert handwriting testimony, that Mrs. Frey had signed the agreement.

The testimony also conflicted on the degree of financial disclosure between the parties. No written financial disclosure was made in preparing the antenuptial agreement, and also, Mrs. Frey did not consult an attorney.

The circuit court declared the antenuptial agreement null and void as against the public policy of Maryland. After the trial judge decided the validity issue, he awarded Mrs. Frey alimony *pendente lite* of $200.00 per week and child support of $150.00 per week. Mr. Frey then noted an appeal to the Court of Special Appeals.

Because of the important public policy question raised in this case, we granted certiorari prior to consideration by the intermediate appellate court.

## II

### *Appealability*

■ The threshold question in the instant case is the jurisdiction of this Court over the appeal. Although both parties agreed and urged that this Court should decide the issue presented, the principle is settled that parties may not confer appellate jurisdiction, on this Court or the Court of Special Appeals, by consent. *See, e.g., King v. State Roads Commission,* 294 Md. 236, 241, 449 A.2d 390, 393 (1982); *Lewis v. Lewis,* 290 Md. 175, 179, 428 A.2d 454, 456 (1981) (and cases cited therein). Nevertheless, we believe that the instant case is appealable as an interlocutory order.

■ Generally, with certain narrow exceptions, under section 12–301 of the Maryland Code appeals must be from final judgments. *King v. State Roads Commission,* 294 Md. at 240, 449 A.2d at 393. Maryland Code (1974, 1980 Repl. Vol.) Cts. & Jud.Proc. Article, § 12–301. Absent an exception, an action of the circuit court is not appealable unless a final judgment has been entered. The policy underlying this

rule is that piecemeal appeals are disfavored. *Cant v. Bartlett,* 292 Md. 611, 614, 440 A.2d 388, 389 (1982). The principal exception to the final judgment rule is section 12–303, which allows appeals from certain interlocutory orders entered by a circuit court in a civil case. Maryland Code (1974, 1980 Repl.Vol.), Cts. & Jud.Proc. Article, § 12–303. Section 12–303(c)(5) allows, *inter alia,* an appeal from an order for the payment of money.

■ In the instant case the circuit court declared the antenuptial agreement void and, having overruled this preliminary objection and having heard evidence, thereafter ordered appellant to pay alimony *pendente lite* of $200.00 per week. "Orders for the payment of alimony or child support are not expressly covered by the statute. However, our cases make clear that such orders are orders '[f]or . . . the payment of money' under § 12–303." *Pappas v. Pappas,* 287 Md. 455, 462, 413 A.2d 549, 552 (1980) (citing with approval *Chappell v. Chappell,* 86 Md. 532, 536–37, 39 A. 984, 986 (1898) (holding that it was certain that payment of alimony was an order to pay money, and was allowed in express terms by the predecessor to the present statute)). *Cf. Anthony Plumbing of Maryland, Inc. v. Attorney General,* 298 Md. 11, 467 A.2d 504 (1983) (reviewing the history of § 12–303, and holding orders for the "payment of money" provision concerns orders in equity and specifically domestic relations litigation).[1] In this case, the order to pay money could not have been made without the order voiding the antenuptial agreement. We could not determine the propriety of the order to pay money without considering the antenuptial agreement order. The order concerning the

---

1. For other cases applying § 12–303 to interlocutory divorce orders see, *e.g., Bledsoe v. Bledsoe,* 294 Md. 183, 185 n. 1, 448 A.2d 353, 354 n. 1 (1982) (possession of property *pendente lite* appealable under § 12–303(a)); *Lewis v. Lewis,* 290 Md. 175, 184, 428 A.2d 454, 459 (1981) (possession of the family home appealable under § 12–303(a), but facts did not support its application); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 24 n. 3, 410 A.2d 1052, 1055 n. 3, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980) (*pendente lite* award of use and possession of family home appealable under § 12–303(a)).

agreement is inseparably involved with the order to pay money and they should be considered together. In our view the matter is properly appealable.

## III

### Merits

■ We now turn to the question presented, that is, whether a provision in an antenuptial agreement that contemplates separation or dissolution of a marriage, by which a spouse waives alimony, is per se void as contrary to public policy. Until today, the answer in Maryland has been "yes." We note at the outset that it is within the power and authority of this Court to change the common law and abrogate judicially created rules. *See Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983). " 'When the rationales which give meaning and coherence to a judicially created rule are no longer vital, and the rule itself is not consonant with the needs of contemporary society, a court not only has the authority but also the duty to reexamine its precedents rather than to apply by rote an antiquated formula.' " *Id.* at 258–59, 462 A.2d at 514 (quoting *Lewis v. Lewis,* 370 Mass. 619, 351 N.E.2d 526, 531 (1976)). The validity of the judicially created rule that we face in the instant case must, therefore, be evaluated in view of Maryland's public policy today. In view of our evaluation, we recognize that we must overrule an outmoded rule.

The law of Maryland follows a once well recognized distinction that treats antenuptial agreements in contemplation of death differently from agreements that contemplate divorce. In *Hartz v. Hartz,* we held that antenuptial agreements concerning the distribution of a decedent spouse's property are favored and are upheld when validly executed. 248 Md. 47, 234 A.2d 865 (1967). We also elaborated on factors to be considered in evaluating whether the agreement was valid and enforceable. *Id.* at 57–59, 234 A.2d 871–72. Although public policy permits such agreements, it nevertheless strictly requires that they be fair and

equitable. *See also Levy v. Sherman,* 185 Md. 63, 43 A.2d 25 (1945).

In *Cohn v. Cohn,* we approved the then well recognized rule that an antenuptial agreement in anticipation of separation and divorce was void as against public policy. 209 Md. 470, 121 A.2d 704 (1956). We stated "that an antenuptial contract which provides for, facilitates or tends to induce a separation or divorce of the parties after marriage is contrary to public policy, and is therefore void." *Id.* at 475, 121 A.2d at 706. Our ruling in *Cohn* preceded a trend that recognized a modern view of marriage and found the policy reasons of the rule no longer persuasive. We have not considered this issue since *Cohn,* in 1956, and today, after reviewing the caselaw, we agree with those jurisdictions that have abandoned the rule which we adhered to in *Cohn.*

In *Cohn,* the rule that the Court followed was based on two policy reasons that supported the rejection of antenuptial agreements contemplating divorce and distinguished them from the situation where the marriage was terminated by the death of one of the spouses. First, as already mentioned, the view was that the state's interest in preserving marriage was defeated by antenuptial agreements contemplating divorce because they facilitated divorce, *id.,* presumably because providing for the financial terms of separation in advance caused discord and instability. Further, because divorce was still based only upon fault in some other states,[2] some courts took the view that the agreement would be abused:

> Such contract could induce a mercenary husband to inflict on his wife any wrong he might desire with the knowledge his pecuniary liability would be limited. In other words, a husband could through abuse and ill treatment of his wife

---

2. Although we recognize that Maryland had no fault divorce in 1956, *see* 1937 Md.Laws 396; 1947 Md.Laws 240, the Court in *Cohn* followed what was the unanimously accepted rule at that time. The significance of no fault divorce on the policy rationale of this rule was not explained until 1970 in *Posner v. Posner,* 233 So.2d 381, 384 (Fla.1970).

force her to bring an action for divorce and thereby buy a divorce for a sum far less than he would otherwise have to pay.

*Crouch v. Crouch,* 53 Tenn.App. 594, 604, 385 S.W.2d 288, 293 (1964). Agreeing to the terms of a divorce before the parties even married was perceived as tending to induce divorce, and eliminating the proper effort to preserve marriage. For example, in *Cohn* the husband left his wife just before the stipulated amount of a lump sum payment was to advance to the next level. 209 Md. at 477, 121 A.2d at 707. Secondly, the state had a further interest in assuring that the wife was supported adequately so that she would avoid becoming a ward of the state. The state had a legitimate interest in preserving the fulfillment of obligations incident to marriage. *Id.* at 477–78, 121 A.2d at 707. Concern was generated by cases in which agreements provided husbands a way out of a marriage for a set sum far below the likely alimony, *see, e.g., Fincham v. Fincham,* 160 Kan. 683, 165 P.2d 209 (1946) (relied upon in *Cohn,* 209 Md. at 476, 121 A.2d at 706), or totally eliminated the wife's right to support, *see, e.g., Hilbert v. Hilbert,* 168 Md. 364, 375, 177 A. 914, 919 (1935). We believe, however, that this concern is treated more appropriately as a question of the validity of the particular agreement, rather than as a total prohibition of antenuptial agreements on public policy grounds.

A trend of jurisdictions abandoning the absolute prohibition of these agreements based on public policy has developed since we ruled in *Cohn.* Two of the earlier cases, *Posner v. Posner,* 233 So.2d 381 (Fla.1970), and *Volid v. Volid,* 6 Ill.App.3d 386, 286 N.E.2d 42 (1972), discussed the policy reasons that supported the old rule. In *Volid,* the court noted that little empirical evidence supports the view that such agreements invite dispute, or encourage separation. 286 N.E.2d at 46. *See also Unander v. Unander,* 265 Or. 102, 506 P.2d 719, 720 (1973). In fact, the court found the possibility equally arguable that such agreements promote rather than reduce marital stability by defining the expectations and responsibilities of the parties. *Id. See*

*also, Newman v. Newman,* Colo., 653 P.2d 728, 732 (1982) (en banc). Further, the roles of the husband and wife have changed, and marital roles are no longer rigidly defined today. *Volid,* 286 N.E.2d at 46–47.

> When the rules regarding the husband's duty of support were first enunciated, the roles of a husband and wife were more rigid and defined. The husband worked and brought income into the family while the wife maintained and managed the household. The woman generally did not seek outside employment partly because "her place was in the home", and partly because few opportunities for meaningful employment were available. Married women nowadays are increasingly developing career skills and successfully entering the employment market. Where a woman is trained, healthy, and employable, and where a woman's efforts have not contributed to her husband's wealth or earning potential, the necessity for an alimony award upon breakup of the marriage is not great.

*Id.*

Although the state has an interest in protecting the institution of marriage, no state interest exists in preserving a marriage in which the relationship has broken down irretrievably. *See Posner,* 233 So.2d at 384; *Unander,* 506 P.2d at 721. We recognize that divorce has become commonplace, and the percentage of marriages that end in divorce is significant. In *Posner,* the Supreme Court of Florida stated:

> With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to consider and discuss also—and agree upon, if possible—the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail.

\*   \*   \*   \*   \*   \*

We know of no community or society in which the public policy that condemned a husband and wife to a lifetime of misery as an alternative to the opprobrium of divorce still exists.

233 So.2d at 384. Further, the appearance of "no fault" divorce statutes in many states acknowledges the necessity of granting divorces. Where public policy recognizes that a marriage may need to be dissolved without the fault of either party, much of the rationale behind the old public policy view fades. The old view's fear that spouses could induce a divorce through fault, without consequence, because the terms of divorce were settled in advance, is no longer persuasive because that spouse could seek a no fault divorce. *Accord, e.g., Posner,* 233 So.2d at 384; *Unander,* 506 P.2d at 721. We recognize that Maryland provides for voluntary separation and divorce, Maryland Code (1957, 1981 Repl.Vol.), Article 16, §§ 24–25. The state's interest is not contrary to marriage partners providing for such a contingency.

■ In reviewing the caselaw we find that a majority of the jurisdictions that have considered the question in recent years no longer find the policy reasons that were relied upon in *Cohn* to be valid, and they have abandoned the view that such antenuptial provisions are void automatically as a matter of public policy. *Newman v. Newman,* Colo., 653 P.2d 728 (1982) (en banc); *Burtoff v. Burtoff,* 418 A.2d 1085 (D.C.1980); *Posner v. Posner,* 233 So.2d 381 (Fla.1970); *Volid v. Volid,* 6 Ill.App.3d 386, 286 N.E.2d 42 (1972); *Matlock v. Matlock,* 223 Kan. 679, 576 P.2d 629 (1978); *Osborne v. Osborne,* 384 Mass. 591, 428 N.E.2d 810 (1981); *Ferry v. Ferry,* 586 S.W.2d 782 (Mo.App.1979); *Buettner v. Buettner,* 89 Nev. 39, 505 P.2d 600 (1973); *Hudson v. Hudson,* 350 P.2d 596 (Okl.1960); *Unander v. Unander,* 265 Or. 102, 506 P.2d 719 (1973). *Cf. Holliday v. Holliday,* 358 So.2d 618 (La.1978) (waiver of alimony *pendente lite* is against public policy; not decide question of permanent alimony); *Connolly v. Connolly,* 270 N.W.2d 44 (S.D.1978) (not void per se, but court has ultimate authority). *Contra In re Marriage of Gudenkauf,*

204 N.W.2d 586 (Iowa 1973); *Mulford v. Mulford,* 211 Neb. 747, 320 N.W.2d 470 (1982); *Duncan v. Duncan,* 652 S.W.2d 913 (Tenn.App.1983). We find this authority persuasive, and we now reject the rule that a waiver of alimony provision in an antenuptial agreement is void per se as contrary to public policy. We agree with the Supreme Judicial Court of Massachusetts' holding in *Osborne,* "that an antenuptial contract settling the alimony or property rights of the parties upon divorce is not per se against public policy and may be specifically enforced." 428 N.E.2d at 816. "The common law is . . . subject to modification by judicial decision in light of changing conditions or increased knowledge where this Court finds that it is a vestige of the past, no longer suitable to the circumstances of our people." *Felder v. Butler,* 292 Md. 174, 182, 438 A.2d 494, 499 (1981) (citations omitted). *See also Boblitz v. Boblitz, supra.* We hold the policy reasons supporting *Cohn* are no longer suitable today.

Furthermore, the General Assembly has expressed the public policy of Maryland such that antenuptial agreements contemplating divorce are recognized, and hence not contrary to public policy. In 1978, the General Assembly enacted what is known as the Marital Property Act which concerns property distribution upon divorce. 1978 Md.Laws 794. Under the statute, the parties may agree what property is not to be considered marital property or family use personal property. Maryland Code (1974, 1980 Repl.Vol.), Cts. & Jud.Proc. Article, § 3–6A–01(c), (e). Through such agreements, the parties can control the distribution of property upon divorce.

The General Assembly is presumed to be aware of the prior holdings of this Court. *Bingman v. State,* 285 Md. 59, 65, 400 A.2d 765, 768 (1979); *Police Commissioner v. Dowling,* 281 Md. 412, 419, 379 A.2d 1007, 1011 (1977). The declaration of public policy is normally the function of the legislature, *Felder v. Butler,* 292 Md. at 183, 438 A.2d at 499, and in determining the public policy of the state we turn to statutory provisions as a primary source. *Id.* at 184, 438 A.2d at 499. The view that agreements in contemplation of

divorce are against public policy, therefore, cannot stand in light of the fact that the General Assembly has included such agreements as a valid method to dispose of property upon divorce by excluding such property from the definition of marital property and thereby taking such property outside the jurisdiction of the circuit court. The statutory provisions express the public policy of Maryland today and, therefore, provide ample basis for our overruling of *Cohn v. Cohn,* 209 Md. 470, 121 A.2d 704 (1956).

■■■■ As a result of our holding, a distinction no longer is to be drawn upon whether an antenuptial agreement is in contemplation of the death of one of the spouses or the dissolution of the marriage.[3] The agreements are not to be rejected automatically as contrary to public policy; rather, the question is the validity of the agreements. All such antenuptial agreements, therefore, are to be evaluated upon the factors indicated in *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967). The agreement must be fair and equitable in procurement and result. *Id.* at 57, 234 A.2d at 871. The parties must make frank, full and truthful disclosure of all their assets. *Id.* The agreement must be "entered into voluntarily, freely and with full knowledge of its meaning and effect." *Id.* Further, we have emphasized the importance of independent legal advice in evaluating whether the agreement was voluntarily and understandingly made. *Id.* Also, in evaluating the disclosure and procurement of the agreement, the trial judge must remember that the parties

---

**3.** Our decision today involves agreements concerning property and financial obligations between the parties and does not relate to the validity of provisions in antenuptial contracts that purport to limit the duty of each spouse to support the other during the marriage, or provide that a spouse is not liable for the support of children that he has a duty to support upon dissolution. We note that there may be agreements, such as these, that nevertheless may be contrary to public policy and may be unenforceable for that reason alone. *See McHugh v. McHugh,* 181 Conn. 482, 436 A.2d 8, 12–13 (1980); *Osborne v. Osborne,* 384 Mass. 591, 428 N.E.2d 810, 816 (1981); *In re Marriage of Dawley,* 17 Cal.3d 342, 551 P.2d 323, 329, 131 Cal.Rptr. 3 (1976) (In Bank).

stand in a confidential relationship. *Id.* at 56, 234 A.2d at 870; *see also Levy v. Sherman,* 185 Md. at 67–72, 43 A.2d at 27–29.

The real test in a determination of the validity of an antenuptial agreement is whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement. Frank, full and truthful disclosure of what is being relinquished (or in lieu thereof actual knowledge otherwise available or obtained) is the key that turns the lock of the door leading to impregnable validity.

*Hartz,* 248 Md. at 57, 234 A.2d at 871 (footnote omitted).

Our approach to determining the validity of antenuptial agreements is consistent with other jurisdictions which stress the stringent tests for validity: whether the agreement was obtained through fraud, duress, mistake, misrepresentation, material nondisclosure, or other overreaching; and whether the agreement was just and equitable. *See, e.g., Newman v. Newman,* Colo., 653 P.2d 728 (1982) (en banc); *Burtoff v. Burtoff,* 418 A.2d 1085 (D.C.1980); *Matlock v. Matlock,* 223 Kan. 679, 576 P.2d 629 (1978).

For the reasons set forth above, we reverse the holding of the trial court and remand to that court for proceedings consistent with our opinion. Because the trial court will determine the validity of the agreement based upon the factors in *Hartz,* we do not reach the question of the appropriateness of the award of alimony *pendente lite* which turns upon the validity of the agreement.

JUDGMENT OF THE CIRCUIT COURT REVERSED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SHARED EQUALLY BETWEEN THE PARTIES.

SMITH, J., concurs in part and dissents in part.

SMITH, Judge, concurring and dissenting.

I dissent from so much of the opinion as holds that the agreement at issue is not void as against public policy. What was against public policy under our earlier opinions was not a premarital agreement as such, but rather that part of the agreement which waived alimony. The majority rely upon Maryland Code (1974, 1980 Repl.Vol.) § 3–6A–01(c) and (e), Courts and Judicial Proceedings Article, as a statement of public policy. What the subsections do is to define family use personal property as property acquired during marriage and marital property as not including "property excluded by valid agreement." Agreement as to disposition of property acquired subsequent to marriage was well known and permitted at the time of our earlier decisions. If § 3–6A–01(c) and (e) can be said to enunciate public policy, it in no way concerns alimony. The reason for the policy stated in our earlier opinions was that the State has an interest in seeing that the marriage tie is not lightly broken. Now that the wife as well as the husband may be obliged to pay alimony, there is just as much reason for the policy as ever.