

SELLMAN *v.* SELLMAN

[No. 424, September Term, 1963.]

*Decided July 13, 1964.*

*Motion for rehearing before the Court en banc filed August 11, 1964, denied September 16, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT and HORNEY, JJ., and RUTLEDGE, J., Associate Judge of the Fourth Judicial Circuit, specially assigned.

*Hilary W. Costello* for appellant.

*Wallace Dann,* with whom were *Howard Calvert Bregel* and *Calvert Ross Bregel* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

The chancellor granted the appellee a limited divorce on the ground of desertion, permanent alimony and custody of, and support for, an infant child of the parties. At the same time, he dismissed appellant's cross-bill, which prayed for a limited divorce on the ground of desertion, and custody of the child.

The appellant claims that the chancellor committed error in seventeen rulings on evidence and seven other alleged assignments of error. However, the case may be determined by answering the following questions: (1) Was the chancellor clearly

4

in error in finding that the appellant deserted the appellee on, or about, July 10, 1962, and that, under the circumstances, the appellee should be awarded custody of the infant child; (2) Did the chancellor commit prejudicial error in holding an alleged "secret" conference at the bench; (3) Did the chancellor commit reversible error in denying appellant's motion for a mistrial; (4) Did the chancellor's rulings on the evidence constitute reversible error?

I

Since the record extract contains 309 pages, it will have to be scaled down considerably in stating the facts, if this opinion is to be of reasonable length. Although the testimony in most of its aspects is sharply in dispute, it is sufficient to support a finding of the following facts. The parties were married in Baltimore in 1936. Three daughters were born as a result thereof. The oldest is married and has her own family. The next in point of age was nineteen at the time of the trial below, was self-supporting, and was living with her mother. The youngest, Gwenda, was eight, and she was enrolled in a boarding school for girls.

After marriage, the conjugal relations of the parties were satisfactory until about nine years ago, when they began to deteriorate. The husband became interested in another woman. He told his wife that he was "very much" in love with this woman, but he loved her (his wife) more than the other woman. She forgave her husband for his relationship with this woman because she wanted to keep the family together and raise her children. However, the husband started on a course of conduct, which finally culminated in his locking her out of the house. The wife stated that when Gwenda was a baby, her husband, who had been drinking, came home, and, without provocation, shoved her and threw her on the bed. She retreated through the house from room to room, but he followed her. She finally wound up in the living room and was sitting in a chair, but he came in and upset the chair, knocking her to the floor. She took the child and left home. However, upon the request of her pastor and the entreaties of her husband, who promised to mend his ways, she returned to the home.

Things were better for a while; then he started "getting very nasty again." The wife testified that he threatened her, kicked and struck her, and threw things at her. He also called her vile and humiliating names. On one occasion, he took a gun and "fired it off" in the house. In 1961, he told her to get "the H. out of" his bedroom, and she did. On another occasion, she had been visiting her "people," and when they brought her home her husband would not open the door; so she was required to spend the night away from home. When she returned on the following morning, she gained entrance by letting Gwenda climb in a window. She testified that his attitude, manner and course of conduct caused her to fear for Gwenda's and her own safety.

On the evening of July 10, 1962, the appellee went to a neighbor's house across the street to call her married daughter on the telephone. The appellant came out into the street and yelled, "Stella Mae [the appellee], come over here and get your G.D. dishes done." Realizing that her husband usually left home each evening at about 7:00 p.m., she waited until he had driven off in his automobile before returning home. After seeing him leave, she returned and was washing dishes when the appellant came home. He went to the kitchen, and "he knocked me [the appellee] down so hard that my back struck the step stool and my arm and bruised it." After getting back onto her feet, she again went to the neighbor's home across the street, and the neighbor saw the bruises. Later that evening she returned to the home and remained there until July 16th.

On July 16th appellant came home in a very "nasty mood." Nothing seemed to please him. He told his wife that "things weren't going to be any better." "If anything they were going to get worse." When he continued his harassment, she went out on the porch and sat down. He continued to make disagreeable comments through the window. Finally she walked down to the corner store to purchase an item. On the way home, she saw Gwenda get a good humor from the good humor man and go back into the house. Upon her arrival at the home, she found all of the lights out and the doors locked. She rapped on the door and rang the bell, but received no response. She phoned her parents, who came and took her to their home. This suit followed.

The chancellor likened the testimony herein to that in the case of *Cullotta v. Cullotta,* 193 Md. 374, and found that "the husband had pursued a policy of abuse and misconduct towards his wife, which made it impossible for her to continue her matrimonial cohabitation with him with safety and self-respect." He further found that: "she forgave him conditionally for his many abuses and indignities which he heaped upon her * * *. Finally, on July 10, 1962, she testified he attacked her so brutally that from that time on she was in great fear of him, and on July 16, 1962, after he had gone into another of his tantrums and locked her out of the house, she was afraid to attempt to force an entry into the house." The case obviously turns upon questions of fact, and we cannot say the chancellor was clearly in error in these findings; hence we shall affirm his granting the wife à divorce. Maryland Rule 886 (a). See also *Hilbert v. Hilbert,* 168 Md. 364, and compare *Sullivan v. Sullivan,* 223 Md. 74.

We turn now to a consideration of Gwenda's custody. We have repeatedly stated that the principal question to be determined in child custody cases is what will subserve the best interests of the child involved. The chancellor seems to have given very careful attention to the matter of custody, obtaining reports from the medical and probation officers of the court. The husband contends that the wife failed to keep a tidy house, and is illiterate, not keeping up with ordinary, everyday events, such as what day of the week is at hand, or how many days there are in a year, etc. The medical officer found that the wife had an I.Q. at the upper end of the borderline range, and he found the patient "anxious, confused, labile, and rather unstable." However, he found "no psychiatric contraindications for Mrs. Sellman to have custody" of the child. In his opinion, the chancellor stated that the wife presented herself as a pleasant person, and "as reported by the Staff of Dr. Guttmacher, a person 'with very little in the way of aggressive or self-asserted energies.'" He added that a number of her neighbors testified "as to the care that she gave her daughter and it is perfectly apparent that she had theretofore satisfactorily reared two other daughters to womanhood." He continued: "None of the witnesses called by Mr. Sellman could, or would, testify that she

[the appellee] was an unfit mother. * * *. The same conclusion was arrived at by Mrs. Therese J. Rosenblatt, an officer of the Probation Department * * *. She recommended that custody be granted to Mrs. Sellman. Likewise, Dr. Michael J. Biscoe, medical officer [of the court], * * * concluded that there are no psychiatric contraindications for Mrs. Sellman to have the custody."

The awarding of custody of children in a split family is not one of the pleasant duties of a Court. However, we have stated on many occasions that, ordinarily, the custody of a child of tender years will be given to the mother, if she is not the party causing the divorce and is a fit and proper person to raise a child. From the record as it is presented to us, we cannot say the chancellor was clearly in error in determining what the best interests of the child require, even though we recognize the appellee is not an ideal person to rear the daughter. She anticipated living in a separate apartment in a two-apartment building (and by now she may be so living), the other apartment being occupied by her parents. She has demonstrated that she has raised two other daughters successfully, and the witnesses confirmed her interest in and affection for the youngest child. The above, when considered with the medical and Probation Department recommendations, turns the scales in the wife's favor, and renders the chancellor's decision relative to custody logical. However, in view of Mrs. Sellman's recognized shortcomings, the Probation Department's recommendation of a thorough and close supervision of the child's custody by that department should be carefully carried out.

## II

We proceed to a consideration of the subsidiary questions. The appellant complains of what he terms "a secret bench conference." It appears that Judge Cardin had a colloquy at the bench with counsel of both parties, which the court stenographer did not take down. The complaint seems to be that the appellant thought that Judge Harris, who had conducted a previous hearing on temporary custody, had stated that Mrs. Sellman was not a fit person to have custody. Appellant's counsel asked the witness Rosenblatt if she knew at the time of the prior

hearing that Judge Harris had made such a statement. The witness replied she was not at the hearing. Whereupon, appellant's counsel requested Judge Cardin to call Judge Harris "as a witness of the court." This Judge Cardin refused to do, but informed counsel that he could have Judge Harris summoned if he desired. This counsel failed to do. We find no error here.

## III

After consuming some four to five days in the taking of testimony, appellant's attorney made a motion for a mistrial on grounds that Judge Cardin had prejudged the result of the trial before hearing all of appellant's witnesses and the judge was prejudiced against the appellant. It appears that after the appellant and one of his witnesses had testified, his counsel requested the court to interview the child in chambers. The court stated that he would be glad to talk with the child (as he later did), and then said: "If you are all through, I will tell you what my next step is going to be. I am going to refer Mrs. Sellman to be examined by Dr. Guttmacher. I want to get a report before I make any further disposition of this case. I want Mrs. Sellman examined by Dr. Guttmacher. At that time I will be ready to dispose of the matter. *Frankly, I believe I have all the testimony I need.*" (The italicized sentence is what appellant particularly objects to.) Just what the chancellor meant by this sentence is not clear, but his entire statement was predicated upon his opening remark, "if you are all through." In any event, the chancellor, upon being advised that appellant had not concluded his testimony, heard all the remaining witnesses that he was requested to hear, and he evidently did not consider that he was prejudiced against the appellant, for he overruled the motion. And our examination of the record fails to disclose any prejudice on the judge's part. Again, we find no error.

## IV

As we noted above, appellant names seventeen alleged errors in the chancellor's rulings on evidence. It would serve no useful purpose and unduly prolong this opinion to consider each separately. We have carefully examined each and every assign-

ment of error, and we are unable to find any reversible error therein.

We note, however, an unusual practice wherein, on several occasions, the chancellor, after sustaining objections to counsel's questions, refused to accept a proffer of what appellant's counsel offered to prove. (We, fortunately, are able to discover from this record that no prejudicial error was committed in the exclusion of evidence.) Of course, the trial judges have considerable discretion in the conduct of trials before them, but it is customary, and has been for many years, to permit counsel to state what they proffer to prove when an objection is sustained to a question propounded by them. This affords an opportunity to determine the propriety of the ruling on appeal. Conceptually, there could arise occasions when counsel might abuse this privilege, but, in the absence of such abuse, he should be allowed to state his proffer. *Hughes v. Averza,* 223 Md. 12.

*Decree affirmed, appellant to pay the costs.*